Filed 11/6/13  P. v. Hernandez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICARDO HERNANDEZ,<br><br>    Defendant and Appellant. | B241787<br><br>(Los Angeles County<br>Super. Ct. No. BA379637) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan M. Speer, Judge.  Affirmed.

Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Kathy S. Pomerantz, Deputy Attorney General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Appellant Ricardo Hernandez was convicted of one count of murder (Pen. Code,[1] § 187, subd. (a)), and six counts of attempted murder (§§ 664, 187, subd. (a)), with gang and firearm allegations found true (§ 186.22, subd. (b)(1)(C), 12022.53, subds. (d), (e)(1)). On appeal, he contends the trial court erred in (1) excluding evidence of third-party culpability, (2) denying his *Marsden*[2] motion, (3) failing to remove a juror, and (4) instructing the jury with CALCRIM No. 600. Additionally, Hernandez alleges ineffective assistance of counsel. Finding no prejudicial error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Charges

The third amended information charged Hernandez with one count of murder (§ 187, subd. (a); count 1), six counts of attempted murder (§§ 664, 187, subd. (a); counts 2-7), and one count of conspiracy to commit murder (§ 182, subd. (a)(1); count 9).[3] As to the murder and attempted murder counts, the information alleged firearm enhancements under section 12022.53 and a criminal street gang enhancement under section 186.22, subdivision (b). The information also alleged the attempted murders were willful, deliberate, and premeditated within the meaning of section 664, subdivision (a). Hernandez pled not guilty to each count and denied the sentence enhancement allegations.

### II. The People's Evidence

A. The Shooting

According to the People's evidence presented at trial, at approximately midnight on September 27, 2009, Ana Contreras was with her friend, Marlene Ramirez and

---

[1]   Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]   *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[3]   Count 8 was alleged only as to the codefendant.

Marlene's[4] infant son, Andrew Garcia; they were sitting inside Marlene's car, which was parked in front of Contreras's house on Kittridge Street in Van Nuys. Contreras was sitting in the front passenger seat, holding Andrew in her arms and feeding him a bottle. Marlene was talking on the phone while seated in the driver's seat. They had just come from a baptism party at a nearby banquet hall. Marlene testified that Frank Garcia, Andrew's father; and Melvin Caravantes, a family friend, had left the party with them.

Frank, Caravantes, Erik Ramirez (Marlene's cousin), and Jovahny Reyes (the father of Contreras's baby) were standing on the sidewalk to the right of Marlene's parked car. Frank, Caravantes, and Reyes were members of a tagging crew called T.G.R. Erik was a member of the Barrio Van Nuys (B.V.N.) gang, although he denied at trial being a gang member.

The group saw two men walking on the sidewalk on the opposite side of the street toward the car. Contreras heard one of the men on the opposite sidewalk scream, "Where are you from?"; shortly afterward, she heard six gunshots. Marlene testified that one of the men appeared to be carrying a bat, which turned out to be a gun. The man carrying the gun asked Erik, "Where you from?" According to Frank, the men across the street had a shotgun covered with a white T-shirt. One of the men asked, "Where you guys from?"; and then Erik called out, "Van Nuys."

Both Contreras and Marlene saw Erik step off the sidewalk. Contreras testified that she saw Erik walk toward the men across the street and pull up his shirt. Erik did not have a weapon. Marlene testified that Erik touched his shirt, but did not lift it up. Marlene further stated that she heard eight gunshots, and that one of the men on the opposite sidewalk started shooting. At that point, Erik and the other men in his group began to run. When the shooting stopped, Marlene saw the two men run past her car.

Contreras was shot in the left eye, leaving her completely blind in that eye. Erik sustained multiple gunshot wounds to his back, neck, and face. Andrew was bleeding

---

[4] Because some of the victims and witnesses share surnames, we refer to them by their first names, not out of disrespect but for convenience and clarity. (See *Cruz v. Superior Court* (2004) 120 Cal.App.4th 175, 188, fn. 13.)

3

and gasping for air.  Marlene took the baby and ran toward a convenience store to get help.  After police and an ambulance arrived at the scene, Andrew was taken to the hospital.  He died from multiple shotgun pellet wounds to his head.

After the shooting, Contreras identified codefendant Alfonzo Landa in a photographic lineup.  Neither Marlene nor Frank was able to identify either suspect.  However, after Frank saw pictures of Hernandez in the media and on the Internet, he recognized him.  Frank also identified Hernandez in court.

Ana Calvario testified that on the night of the shooting, she was living on Sylmar Avenue.  At about 12:15 a.m., she heard gunshots coming from Kittridge Street.  She then saw two young Hispanic men, one of whom was carrying a "very big" gun by his side.  The man carrying the gun had pimples on his face and his ears were "very big."  Once the men saw Calvario, they ran toward Vanowen Street.  Following the incident, Calvario identified Hernandez in a photographic lineup.  She based her identification on the shape of his face, his pimples, and his ears.

At around midnight on September 29, 2009, Humberto Salcido was leaving his job at the animal control facility on Vanowen Street.  As he was pulling out in his car, two men approached him and asked him for a ride.  They were Hispanic, appeared to be in their mid-twenties, had shaved heads, and were wearing baggy clothes.  When they approached him, one of the men came to the driver's side and the other went to the passenger side of Salcido's car.  Salcido noticed that the man standing on the driver's side was missing a tooth and had "freckles" on his face.  After Salcido declined to give them a ride, the man standing on the passenger side reached through the window and attempted to unlock the door.  Salcido drove away.  Salcido later reviewed photographic lineups, but could not identify either suspect.

Ruby Barboza lived on Blythe Street.  On September 26, 2009, Barboza saw Hernandez and codefendant Landa near her residence around 7:00 p.m.  She asked them where they were going, but they would not tell her.  Codefendant Landa told Barboza to keep her phone on.

4

Police recorded an interview with Barboza conducted after the shooting. During the interview, Barboza told the detectives that she left her apartment at 5:00 p.m. on September 26, and returned home around midnight. Hernandez and codefendant Landa were partying at her apartment. Barboza threw them out. Later that night, Barboza again saw Hernandez and codefendant at her apartment. She told police that Hernandez went inside the building "real quick," and that Hernandez and codefendant Landa stayed at her apartment that night. During the interview, Barboza also identified Hernandez in a photographic lineup. At trial, Barboza further testified that in 2009, Hernandez was missing a tooth.

Carlos Garcia, a member of the Blythe Street gang, talked with police about the shooting. At trial, Carlos denied telling police that he was on Blythe Street on September 26, 2009, and that he saw Hernandez that night. Carlos also denied telling police that he drove with Hernandez and codefendant Landa to the area of Van Nuys Boulevard and Vanowen Street before midnight on September 26. Carlos further denied that he had identified Hernandez and the codefendant in photographic lineups.

B. Police Investigation

The police recovered six spent shotgun casings, three shotgun wads, a white men's tank top, and blood evidence from the crime scene. The shotgun shells were "three-and-a-quarter Remington 12-gauge shotgun" casings.

Police later conducted a search of an apartment building on Blythe Street, and located a white T-shirt, a live shotgun round, and a shotgun–which was concealed inside a pillowcase–in a small crawl space under the building. The recovered gun was a Mossberg 12-gauge sawed-off pistol-grip shotgun. Firearms analysis determined that the six spent shotgun casings collected from the scene of the shooting were fired from that shotgun. DNA recovered from the T-shirt matched Hernandez's DNA. The major profile from the shotgun also matched Hernandez's profile.

Detective James Nuttall of the Los Angeles Police Department ("LAPD"), the investigating officer, testified that on July 2, 2010, Hernandez was taken into custody at

5

Los Angeles International Airport.  Police thereafter obtained a DNA sample from Hernandez.

LAPD Officer Mark O'Donnell testified that on March 22, 2012, he attempted to photograph Hernandez's mouth and teeth pursuant to a court-issued order.  O'Donnell testified that Hernandez refused to comply and would not show his teeth to him.  He also noticed that Hernandez was missing a tooth on the upper right side of his mouth.

C.  Gang Evidence

LAPD Officer Joshua Ordonez testified that in 2006, he was assigned to the Van Nuys Gang Enforcement Detail.  On April 29, 2006, Ordonez saw Hernandez in the area of Victory Boulevard and Haskell Avenue in Van Nuys.  Hernandez told him that he had been a member of the Blythe Street gang and the Nite Outs gang clique for about two years.  Ordonez also testified that at the time, Hernandez was missing a tooth on the upper front area of his mouth.

LAPD Officer Nick Giordano testified that in 2009, he saw Hernandez in front of 14619 Blythe Street.  Hernandez was wearing a Boston Red Sox hat with a "B."  Members of the Blythe Street gang were known to wear hats and clothes with the Boston Red Sox "B."

The prosecution gang expert, LAPD Officer Ralph Brown, testified that the Barrio Van Nuys and Blythe Street gangs were rivals.  Blythe Street gang members wore clothing with the letter "B", including Boston Red Sox or Brooklyn Dodgers attire.  According to Brown, Erik was a member of B.V.N. and his monikers were "Risky" and "Lil Necio."  Brown further testified that Hernandez and codefendant Landa were both members of the Blythe Street gang.  Hernandez had a "Blythe" tattoo on his chest and his moniker was "Playto."

Officer Brown testified that the question "Where are you from" is a gang challenge.  Brown also stated that in gang culture, a "mission" consisted of two or more gang members committing a crime together within a rival gang's claimed territory.

6

When given a hypothetical based on the facts of this case, Officer Brown testified that, in his opinion, the crimes were committed for the benefit of the Blythe Street gang.

### III. The Defense Evidence

LAPD Officer Allan Salazar testified that he was assigned to the gang unit in 2009. Salazar had a number of gang contacts with Erik and knew Erik had been served with the Barrio Van Nuys gang injunction. Erik admitted to Salazar that he was from B.V.N. and that his moniker was Lil Necio.

Rufo Amores, an LAPD officer, also had multiple contacts with Erik. Amores testified that the most "significant" contact occurred on February 2, 2008, when he observed Erik with another documented gang member, Sergio Rodriguez. Erik admitted to Amores that he was a Barrio Van Nuys gang member.

LAPD Detective Brigitta Shapiro interviewed Contreras a few hours after the shooting. During the interview, Contreras told her that Marlene, Andrew and Frank came over to her house around 10:00 p.m. on September 26, 2009. Contreras had just taken a shower and was hanging out with Marlene in her car. Contreras also told Shapiro that she saw only one man walking on the north side of Kittridge Street, and that he did not look like a gangster. Contreras did not tell Shapiro that the suspect had said anything before the shooting, and further denied that the people she was with were affiliated with B.V.N.

Detective Peter Barba testified that he spoke with Marlene at the hospital after the shooting. Marlene told Barba that she heard someone say, "Where you from?," but did not know who said it. Marlene did not mention to Barba that Erik told the shooter he was from B.V.N.

The defense also called Erik Ramirez as a witness. Erik testified that he was on Kittridge Street on September 26, 2009, and denied being a member of the Barrio Van Nuys gang. Erik further testified that he did not say anything on the night of the shooting, nor did he hear anyone ask "Where are you from?"

7

## V. Verdict and Sentencing

The jury found Hernandez guilty on all counts for murder and attempted murder. The jury found the murder to be in the first degree and the attempted murders to be willful, deliberate, and premeditated. It found true the firearm enhancements under section 12022.53, and the allegation the murder and attempted murders were committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1). The jury was unable to reach a verdict as to count 9 (conspiracy to commit murder), and the court dismissed it on the prosecution's motion.

The trial court sentenced Hernandez to 100 years to life: (1) 25 years to life on count 1, with a minimum eligible parole date of 15 years based on the criminal street gang enhancement, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d); (2) a consecutive life term for each of the attempted murders charged in counts 3 and 4, with a minimum eligible parole date of 15 years for the criminal street gang enhancement, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d); and (3) concurrent life terms for each of the attempted murders charged in counts 2, 5, 6, and 7, with a minimum eligible parole date of 15 years for the criminal street gang enhancement, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).

Hernandez filed a timely notice of appeal.

## DISCUSSION

Hernandez challenges the exclusion of certain evidence of a third-party's culpability, the refusal to appoint new counsel to represent him, and the failure to remove Juror No. 2 during trial. He also raises challenges to the "kill zone" instructions given to the jury, and contends that reversal is warranted due to ineffective assistance of counsel.

8

## I.  Third-Party Culpability Evidence Claim

According to Hernandez, the trial court's refusal to admit third party culpability evidence was an abuse of discretion and violated his constitutional rights to present a defense, to due process and to a fair trial.

### A.  Relevant Proceedings

Prior to and during trial, Hernandez attempted to present evidence that "Insane," another Barrio Van Nuys gang member, was responsible for the shooting involving Contreras, Marlene, Andrew, Erik, Frank, Caravantes, and Reyes.

1. *March 26, 2012*.  The prosecutor addressed the issue of third party culpability evidence by informing the trial court of the events that transpired on the night of September 26 prior to the shooting.  According to the prosecutor, Frank had attended a baptism around the corner from where the shooting occurred.  Frank was a tagger who belonged to a tagging group called "Taggers Get Respect" (T.G.R.).  The prosecutor opined that T.G.R. was affiliated with B.V.N.  The prosecutor further relayed that Frank had done some tagging at the party, which prompted a verbal confrontation with a B.V.N. member, later identified with the nickname "Insane."

The prosecutor argued that evidence of the prior confrontation should be excluded because it had no evidentiary support and there was "no nexus" between the earlier altercation at the baptism and the shooting.  Defense counsel argued that the potential suspect known as "Insane" could possibly be a third party who was liable for the shooting.

The trial court tentatively denied defense counsel's request to call civilian witnesses to establish a third party culpability defense.  The court stated that motive alone was not enough to allow the admission of such evidence.  The court continued:  "It appears to be not sufficient to create a reasonable doubt.  The only connection, as you indicated, appears to be an earlier argument with Frank Garcia, who is a victim in this case, and that they're somewhat close in time but not terribly close in time."

9

2. *April 3, 2012*.  During cross-examination of Ana Contreras, defense counsel asked her, "Now, isn't it true that you actually heard Marlene talking on the phone about Frank getting into an argument with a group called M.A.D.?"  The court sustained the People's relevance objection and rejected defense counsel's request to solicit testimony about third party culpability.  The court stated, "A motive alone is not enough without further proof that a third party is culpable."

3. *April 4, 2012*.  During cross-examination of Marlene Ramirez, defense counsel inquired whether she knew who was responsible for the shooting.  Marlene responded, "M.A.D."  Upon objection and move to strike, the court struck that testimony and directed the jury to disregard it.  The court then reaffirmed its ruling to exclude third party culpability evidence.

4. *April 4, 2012*.  Later that same day, defense counsel indicated that he wanted to make a "full" offer of proof regarding the third party culpability evidence as follows:

[Defense Counsel]:  "A party is close [sic] proximity to the shooting within a few blocks away.

"Number two, her husband Frank Garcia is in a confrontation with the B.V.N. member."

The COURT:  "Who is a few blocks away?"

[Defense Counsel]:  "The party that Maria Ramirez – not Maria – Marlene."

The COURT:  "'The party', meaning the event?  I was thinking you meant person."

[Defense Counsel]:  "I'm sorry, the event."

The COURT:  "Few blocks away?"

[Defense Counsel]:  "Few blocks away.

"Number two, Marlene Ramirez's husband Frank Garcia is in a confrontation with a B.V.N. gang member.

"Number three, he's an associate of B.V.N., meaning Frank Garcia is an associate of B.V.N., and a tagger from T.G.R."

…

[Defense Counsel]: "[Number four.] Guy – this guy – there's a guy from B.V.N. known as Insane – was upset that Frank had disrespected B.V.N. gang. Insane is a known B.V.N. gang member – I-N-S-A-N-E.

"There's a person at the party, the event, named Shady who was a known B.V.N. gang member, who breaks up the argument between Frank and Insane from B.V.N.

"Number six, Frank Garcia had crossed out or wrote T.G.R. on B.V.N. property.

"Number seven, Insane told Frank that Frank had disrespected B.V.N. property.

"Insane – number eight – is five foot six to five foot seven with light skin. That's the same as [] Hernandez."

…

[Defense Counsel]: "Number nine, Insane was thin. Both Marlene Ramirez and Ana Contreras describe the guy on Kittridge, the taller guy being chubby and the shorter guy being thin. That would be consistent with [] Hernandez.

"The time of the altercation between Frank Garcia and the B.V.N. gang member is within a few hours of the shooting on Kittridge at midnight of September 26, '09.

"Insane was bald headed. My client is described as being bald headed, meaning at the time if he's believed to be the shooter.

"Insane is Hispanic. My client is Hispanic.

"It's – Insane was – there would be testimony, if the court allows it, that Insane was drunk.

"Insane had a light-colored shirt on at the party. The shooter had a light-colored shirt on, it's white.

"The – Marlene Ramirez had that conversation on the phone about this argument. Frank Garcia was in this altercation.

"So you have much more than M.O. in this. You actually have the description correlating with the same description of my client. So it's not just M.O., it's close in time, proximity, description, so it's more than mere motive."

Defense counsel informed the court that Marlene and Frank could testify to the aforementioned evidence, which, according to counsel, was contained in the police reports.

The trial court stated:

"But without more, again you seem to be establishing motive only and between gang members I'm sure there's a couple hundred motives out there between gang members to shoot each other more so between rival gangs rather than an associate of one gang against the associate of another gang.

"I'll check the cases again, but my recollection is the same as Mr. Akemon's. It has to be some nexus. It has to be more than just mere motive.

"And the generic description doesn't seem to rise to the level of the nexus, only shows a motive. But it was apparently dissipated without any further threats and it doesn't appear you have the witness to even prove it up."

The court concluded, "Without more–unless you can supply me with some police reports or something more convincing from a witness or police reports–my ruling stands."

5. *April 6, 2012*. The trial court, having reviewed a transcript of Frank's interview with police and a two-page summary of the interview, stated that Frank "lays out two possible other perpetrators or motives that other perpetrators would have had in conducting the shooting." The court discussed the events leading up to the altercation at the party, noting that a third party intervened and "calmed everything down." The court further noted that Frank told police Erik had beaten up a member of M.A.D. around the corner from and "very close in time" to the shooting. Thus, the court concluded, "So it could have been someone from B.V.N. having an issue with Frank Garcia or someone from M.A.D. having an issue with Erik Ramirez."

12

Defense counsel argued that Marlene or Frank might have called Erik to come to the location on Kittridge Street because they were afraid there would be some type of confrontation. The court again rejected defense counsel's offer of proof, stating there was insufficient evidence to admit third party culpability evidence and that such evidence "would only cause extra time and confusion to the jurors."

## B. Governing Law

A criminal defendant has the right to present evidence of third-party culpability if the evidence is capable of raising a reasonable doubt about his or her own guilt. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 (*Bradford*).) However, the admission of such evidence remains subject to the general requirement of relevance and the trial court's discretion to exclude unduly prejudicial or confusing evidence: "'We repeatedly have indicated that, to be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. [Citations.]' ¶ In *People v. Hall* (1986) 41 Cal.3d 826, we held that 'the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.' (*Id.* at p. 833.) 'Our holding [in *Hall*] did not, however, require the indiscriminate admission of any evidence offered to prove third-party culpability. The evidence must meet minimum standards of relevance: "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." [Citation.] We also reaffirmed that such evidence is subject to exclusion under Evidence Code section 352.'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 367-368.)

## C. The Trial Court Did Not Commit Prejudicial Error in Excluding Evidence of Third-Party Culpability

The trial court did not abuse its discretion in excluding the proffered testimony. To warrant admission, Hernandez needed to present some admissible evidence that the shooter was either Insane or someone other than Hernandez. Under *Hall*, *supra*, 41 Cal.3d 826, third-party culpability evidence is not admissible where it shows only that another possesses the motive or opportunity to commit the crimes. Here, the evidence that the defense proffered as to Insane's commission of the charged crimes was that he was involved in a verbal altercation with Garcia prior to the shooting in a place in close proximity, and generally fit a physical description of Hernandez. The defense presented no forensic evidence or eyewitness statements to show that Insane was present at the scene of the shooting when the shooting occurred; that he fired a gun; or that he shot at the victims in this case. (*See Bradford*, *supra*, 15 Cal.4th at pp. 1324-1325 [evidence of third-party culpability inadmissible because it did not link someone other than the defendant to the perpetration of the crime].)

In any event, even if the exclusion of the evidence were error, the court's ruling was not prejudicial. We review the record using the harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818, 837. (*People v. Hall*, *supra*, 41 Cal.3d at p. 836). The evidence of Hernandez's guilt was strong, including: the eyewitness testimony; Calvario's identification of Hernandez; Hernandez's refusal to have his mouth and teeth photographed; and Hernandez's DNA found on both the shotgun used in the shooting, and the T-shirt recovered from the crime scene. In contrast, the tendered evidence demonstrated no link between Insane and the crimes. Accordingly, on this record, it is not reasonably probable Hernandez would have received a more favorable verdict had the evidence of the altercation at the baptism party earlier in the night been admitted.

14

**D. Hernandez Failed to Demonstrate He Was Prejudiced By His Counsel's Conduct**

Hernandez further argues his counsel was ineffective for failing to object to the exclusion of evidence on all legal grounds, and for failing to file a written motion in support of his culpability claim prior to trial.

To prevail on a claim of ineffective assistance of counsel, "a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659-660.) Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) It is not necessary for the court to examine the performance prong of the test before examining whether the defendant suffered prejudice as a result of counsel's alleged deficiencies. (*Id.* at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice…that course should be followed." (*Ibid*.)

As discussed above, the trial court properly excluded evidence regarding the earlier altercation between Frank and Insane the night of the shooting, and any possible error in this regard was not prejudicial. Accordingly, the ineffective assistance of counsel claim fails.

**II. *Marsden* Motion**

Hernandez next argues the trial court abused its discretion in denying his *Marsden* motion to appoint new counsel. He asserts an irreconcilable conflict existed between him and his appointed counsel that made effective representation impossible.

## A. Relevant Proceedings

On March 1, 2012, Hernandez requested that the court replace his appointed attorney, Mark P. Brandt, because he was unsatisfied with Brandt's representation. Hernandez explained that they had "disagreements on certain things" and Brandt had not adequately communicated with him. He further complained, "One of the main things is that we haven't done the motions. I asked him if we'll do some motions and he said no, that's not necessary, but I disagree with that." Hernandez, however, could not tell the court what specific motions he wanted Brandt to file.

In reply, Brandt indicated that he had seen Hernandez "numerous times," "interacted with him," and provided him with discovery. He stated, "I feel like our relationship has been okay." Brandt further advised the court that he had investigated "many different things on [the] case," and had a DNA expert appointed. He also indicated that he had gone through the discovery and there was "[not] a valid [Penal Code section] 995" in the case. According to Brandt, there were no other motions he could bring and he was ready for trial.

The court explained to Hernandez that it was improper to file "frivolous" motions, and noted that Brandt had experts appointed, had met with Hernandez many times, and had provided him with discovery. In denying the *Marsden* motion, the trial court told Hernandez: "[T]o the extent there are disagreements between the two of you, I have to err on the side of Mr. Brandt," and continued, "There are no additional motions that I can see he should have brought or needs to bring." Finding no other basis to replace Brandt, the court denied the motion.

On March 22, 2012, Hernandez renewed his *Marsden* motion, summarizing his complaints about Brandt as follows: "There is a complete break down in the attorney-client relationship. Counsel has expressed himself an [sic] made it clear to the client that there isn't anything he could do for the client and that the client will not receive a fair trial in (Van Nuys) court. The client requested for counsel to file pre-trial motions, full discovery under Brady, Change of Venue, Suppression motion and subpoena possible witnesses etc. etc. [sic]."

16

After reading the motion, the court clarified with Hernandez that Hernandez's complaints had been the subject of the prior *Marsden* hearing. In response, Hernandez advised the court that Brandt had told him he "can't do nothing for me," and that he was not going to have a fair trial in Van Nuys. The court stated, "If there's nothing more legally he can do, there's nothing more legally we can do."

In response, Brandt contended that he had a private investigator appointed, visited Hernandez in jail many times, and had the DNA analyzed at a separate lab, but that it came back as Hernandez's DNA. Brandt also indicated that he had told Hernandez that the Van Nuys court was "tough" and "conservative," but denied telling Hernandez he would not receive a fair trial there.

Once again, the trial court refused to replace counsel. The court ruled that any breakdown in the relationship between Hernandez and Brandt was due to Hernandez's "unhappiness" with the situation," and that Brandt had "done everything he [could] possibly do to properly represent [Hernandez] up until this point."

## B. Governing Law

A defendant may seek appointment of new counsel where the appointed attorney is not providing adequate representation or the defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation will likely result. (*People v. Welch* (1999) 20 Cal.4th 701, 728.) Denial of a *Marsden* motion is not an abuse of discretion unless the defendant shows that a failure to replace the appointed attorney would "substantially impair" his or her right to assistance of counsel. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)

Where a defendant seeks to discharge appointed counsel on the basis of inadequate representation, the trial court must allow the defendant to explain his dissatisfaction with counsel. (*Marsden*, *supra*, 2 Cal.3d at p. 124.) "A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People v. Hart*

17

(1999) 20 Cal.4th 546, 603.)  The number of times a defendant sees his attorney and the way in which the defendant relates to his attorney does not by itself establish incompetence.  (*Id.* at p. 604.)  A *Marsden* motion should only be granted where the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation."  (*People v. Crandell* (1988) 46 Cal.3d 833, 859 (*Crandell*).)

Where, as here, the trial court has made factual findings in evaluating a *Marsden* motion, those findings are entitled to deference, and we review them under the substantial evidence standard.  "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.' [Citation]."  (*People v. Smith* (1993) 6 Cal.4th 684, 696.)

## C. The Trial Court Did Not Abuse Its Discretion in Denying Hernandez's *Marsden* Motion

On this record, the court properly exercised its discretion by refusing to appoint new counsel.  There is no evidence Hernandez and Brandt were embroiled in an irreconcilable conflict of such magnitude that ineffective representation was likely to result.  After Hernandez explained his reasons for seeking new appointed counsel, Brandt provided assurances to the court that he had visited Hernandez many times, provided him with discovery, had a DNA expert and private investigator appointed, was prepared for trial, and did not believe a Penal Code section 995 motion had any merit.  Brandt's responses to Hernandez's complaints were reasonable and the trial court was justified in relying on those assertions.  While the record also demonstrates Hernandez was not communicating with Brandt, refusing to cooperate with counsel does not show "irreconcilable differences" and is not a ground for appointment of new counsel. (*Crandell*, *supra*, 46 Cal.3d at pp. 859-861; see also *People v. Hardy* (1992) 2 Cal.4th 86, 138 [A defendant may not force the substitution of counsel by his own conduct that manufactures a conflict.].)

## III. Failure to Remove a Juror

"'[T]he right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution.'" (*People v. Earp* (1999) 20 Cal.4th 826, 852; see *In re Hitchings* (1993) 6 Cal.4th 97, 110 ["one accused of a crime has a constitutional right to a trial by impartial jurors"].) Hernandez contends the trial court's failure to replace Juror No. 2 violated his right to trial by impartial jurors.

## A. Relevant Proceedings

Near the end of trial, the trial court informed all counsel that a physical fight had broken out in the hallway between two women from the courtroom next door. The women were not connected with Hernandez's trial. The court further explained that Juror No. 2 had intervened in an attempt to break up the fight. The court offered to inquire of Juror No. 2 whether he had any bias or prejudice, but neither the prosecutor nor defense counsel believed it necessary.

Later that day, in the presence of the prosecutor and defense counsel, the trial court spoke to Juror No. 2, who discussed the physical altercation that occurred in the hallway. According to Juror No. 2, he had gone to help Juror No. 9, who was the first person who tried to break up the fight. While Juror No. 2 was asking one of the women to let go of the other, a deputy grabbed him and tried to put his arm behind his back. The deputy told him, "You calm down." Some people who witnessed the altercation informed the deputy that Juror No. 2 was just trying to help. As Juror No. 2 then went to sit down, another deputy asked, "Where are you going?" The other jurors told the deputy that Juror No. 2 was not involved in the fight.

Juror No. 2 stated that after the incident, he felt "sad" and "a little bit embarrassed" because he was just trying to help. He said that he was not going to come back to court after lunch, but "that's a weird way of dealing with it." Juror No. 2 further stated that he was "angry," and "[did not] want to have anything to do with anybody in here."

19

At that point, the following exchange occurred:

The COURT: "So how would this affect you at all as a juror?"

JUROR NO. 2: "Well, I don't – let me preface it by saying I was enjoying the experience, you know, so I'm – this is not like – I didn't say oh, I can use this to get away from this because that's not what I wanted.

"But honestly, I don't want to be here anymore. I mean I – I feel like, you know, I've been – somebody's taken a dump on me for trying to help somebody, a fellow juror who were calling for help, and no one else wanted to respond, so I did, and out of everybody there."

The COURT: "I'm sorry this happened to you. You are doing the right thing and they got the wrong impression."

JUROR NO. 2: "Yeah. I mean, I'm there trying to explain like, oh, like what? What is this?"

The COURT: "Do you think you can hang in there, think about it tonight and see how you feel? You know, we're approaching the end, we think we're going to rest tomorrow, if not early the following day. So we are on time and it would be problematic to lose you."

JUROR NO. 2: "I feel – it's a weird feeling. You know, I feel no longer a part of the group, you know, because now I'm like oh, you know, oh – I don't like all that, you know. It just added to my problems, you know, everybody patting me on the back.

"I don't want you to – I didn't want it to happen, you know what, patting me on the back is not –"

The COURT: "Nothing I can do about that."

JUROR NO. 2: "I know."

The trial court apologized again and stated, "It's really not good cause to excuse you and I don't want to." The following exchange then occurred:

20

The COURT: "Do you think you can hang in there and see how you feel tonight and maybe tomorrow you'll have a different –"

JUROR NO. 2: "I don't want to, you know? I mean, yeah, I don't – you know, the only thing that I'm really thinking about now is what I can do to make it known what that person did, you know."

The COURT: "You can file a formal complaint."

JUROR NO. 2: "Right. Is that with the sheriffs?"

The COURT: "Yes."

JUROR NO. 2: "Then that's what's on my mind. That's what's been on my mind since lunch, you know, should I talk to you. But now I know and now that's no longer concerned about talking to you anymore."

The COURT: "I can get you a supervisor down if you want to make a formal complaint."

JUROR NO. 2: "I do."

The COURT: "Okay. With that, do you think that will satisfy you enough to stay on the jury a few more days?

JUROR NO. 2: "Yeah – you know, I really just wanna go home. But, you know, whatever. I don't want to – you know, it's not about me affecting the process, you know, it's just I – "

The COURT: "I know you feel uncomfortable being here now."

JUROR NO. 2: "Yeah."

The COURT: "But we're in the home stretch here."

JUROR NO. 2: "Yeah, but I'm really ambivalent because I know that I could just say 'F' it and just leave and whatever. I mean, you know, what are you going to do? I mean somebody has wronged me, you know? You can have an issue if you want, you know, but it's – I've been screwed over a little bit in front of my peers and I don't like it.

The COURT: "I'm awfully sorry that that happened in our courthouse, especially to one of our jurors."

21

| | |
|---|---|
| JUROR NO. 2: | "Yeah." |
| The COURT: | "We really appreciate your service. I'll call a supervisor down, we'll have him come down at the break. We'll start now. So maybe about 3:00 o'clock on the break. I'll direct him to you outside the presence of the other jurors." |
| JUROR NO. 2: | "All right." |
| The COURT: | "Would that work for you?" |
| JUROR NO. 2: | "All right, that's fine." |
| The COURT: | "We'll talk tomorrow.<br><br>"The other jurors are in the jury room or if you want to go – if you want to wait out front, you can too, whichever you prefer." |
| JUROR NO. 2: | "I don't want to be any more separated, you know." |
| The COURT: | All right, let's take you to the jury room. We've got a couple of things to do on the record. I'll get ahold [sic] of the supervisor and we'll bring you out in just a few minutes." |

The court then informed the parties: "I plan to do just as I said, keep him on the jury. If he makes a complaint tomorrow, we'll address it then. I'll allow him to make a formal complaint regarding the deputy's behavior with a supervisor here."

## B. Governing Law

Penal Code section 1089 provides for a juror to be discharged, and replaced by an alternate, if "upon [] good cause shown to the court [the juror] is found to be unable to perform his or her duty." A juror who indicates that he cannot follow the court's instructions is unable to perform his duties, and may be removed; the decision of the trial court in this regard is reviewed for an abuse of discretion. (*People v. Williams* (2001) 25 Cal.4th 441, 448.) "Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial

22

court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence. [Citation]." (*People v. Holt* (1997) 15 Cal.4th 619, 659.)

## C. The Trial Court's Failure to Remove Juror No. 2 Was Not An Abuse of Discretion

As set forth in detail, the trial court questioned Juror No. 2 in the presence of counsel for both sides. While Juror No. 2 initially expressed obvious displeasure with continuing to sit as a juror, his attitude appeared to change during the discussion when offered to make a complaint. The record does not indicate that Juror No. 2 was refusing to deliberate or had any problem continuing to serve.

This was sufficient evidence on which the court could conclude Juror No. 2 would be able to deliberate. (See *People v. Zapien* (1993) 4 Cal.4th 929, 994 [In favorably assessing the credibility and sincerity of this juror, the trial court had the benefit of observing his demeanor; it is therefore appropriate on appeal to defer to the trial court's implied findings].)

## D. Hernandez's Counsel was Not Constitutionally Ineffective

Hernandez also claims his trial counsel rendered ineffective assistance of counsel by failing to object on this matter on federal constitutional grounds. As discussed above, the court did not abuse its discretion; accordingly the ineffective assistance of counsel does not lie.

## IV. CALCRIM No. 600 – The "Kill Zone" Instruction

Hernandez challenges CALCRIM No. 600, asserting it defines attempted murder using "fatally flawed unconstitutional language." He contends the instruction lowered the prosecution's burden of proof by substantially expanding the liability for attempted murder, permitting the jury to find him guilty of attempted murder even if he did not intend to kill any of the individuals who were in the "kill zone."

23

## A. Relevant Proceedings

The court instructed the jury on attempted murder pursuant to CALCRIM No. 600. That instruction states:

"A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Marlene Ramirez, Ana Contreras, Jovahny Reyes, Frank Garcia and Melvin Caravantes charged in Counts 2, 3, 5, 6, and 7 on concurrent-intent theory, the People must prove that the defendant not only intended to kill Eric Ramirez but also either intended to kill Marlene Ramirez, Ana Contreras, Jovahny Reyes, Frank Garcia and Melvin Caravantes on concurrent-intent theory, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Marlene Ramirez, Ana Contreras, Jovahny Reyes, Frank Garcia and Melvin Caravantes on concurrent-intent theory or intended to kill Eric Ramirez by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Marlene Ramirez, Ana Contreras, Jovahny Reyes, Frank Garcia and Melvin Caravantes."

## B. Governing Law

"When considering a claim of instructional error, we review the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible matter. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

A "defendant may be convicted of the attempted murders of any within the kill zone, although on a concurrent, not transferred, intent theory." (*People v. Bland* (2002) 28 Cal.4th 313, 331 (*Bland*).) "The conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them." (*Id.* at p. 329.) Concurrent intent exists "'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in

order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim…. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (*Id.* at pp. 329-330)

## C. The Trial Court Did Not Err in Instructing the Jury with CALCRIM No. 600

We conclude there is no reasonable possibility that the jury misconstrued CALCRIM No. 600 so as to eliminate the requirement that it find that Hernandez had the specific intent to kill each of his victims.

The jury was properly instructed on the elements of attempted murder, including the requirement of the specific intent to murder the person whose attempted murder is charged. CALCRIM No. 600 itself instructed the jury that to convict defendant of the attempted murder of the six victims, "the People must prove that: 1. The defendant took at least one direct but ineffective step toward killing another person; ¶ AND ¶ 2. The defendant intended to kill that person." CALCRIM No. 601 informed the jury that to find that an attempted murder was done willfully, the jury had to find that the defendant "intended to kill when he acted." "The 'kill zone' portion of CALCRIM No. 600 was superfluous. That theory 'is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.'" (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1243, quoting *Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6; see also *People v. Smith* (2005) 37 Cal.4th 733, 746.)

Even if the instruction had been erroneous, any the error would be harmless in that it was not reasonably probable that if a correct instruction had been given a verdict more

25

favorable to Hernandez would have resulted. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1157 [misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated in *Watson*, *supra*, 46 Cal.3d at p. 836].) The evidence of Hernandez's intent to kill everyone in the group was overwhelming under the "kill zone" theory or otherwise. Based on the trial testimony, Hernandez fired at least six shots at Erik *and* the individuals who were either standing next to him or sitting in the car near him. In short, Hernandez fired multiple shots at a group of people, thereby creating a "killing zone" and placing everyone in jeopardy. In our view, this was sufficient evidence to support the "kill zone" instruction. (See, e.g., *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1393 ["kill zone" instruction proper where defendant fired at a group of people outside of a market].)

**D. Hernandez's Counsel was Not Constitutionally Ineffective**

Finally, Hernandez argues his trial counsel's failure to object on federal constitutional grounds to CALCRIM No. 600 constituted ineffective assistance of counsel. As we explained above, there was strong evidence supporting Hernandez's conviction for the attempted murder of the victims. Because Hernandez has not shown he was prejudiced, his claim has no merit.

## DISPOSITION

The judgment is affirmed.


ZELON, J.


We concur:


PERLUSS, P. J.


SEGAL, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.